# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 18, 2011 Session

## STATE OF TENNESSEE v. ROBERT FANN, JR.

**Direct Appeal from the Circuit Court for Sequatchie County**
**No. 4611     Thomas W. Graham, Judge**

---

**No. M2011-00241-CCA-R3-CD - Filed July 12, 2012**

---

After a trial by jury, the defendant was found guilty of rape, a Class B felony, and incest, a Class C felony. He was sentenced to a total effective sentence of ten years. On appeal, the defendant raises numerous challenges to his convictions and sentences. The defendant claims that the evidence is insufficient to support his convictions. However, his argument is based on alleged inconsistencies in the evidence, and conflicts in the evidence provide no basis for reversing a defendant's convictions. The defendant claims that the trial court erred by admitting the testimony of a police officer concerning statements that the defendant made to his wife in the officer's presence because these statements were protected by the martial privilege. However, we conclude that the statements were not privileged because the defendant had no reasonable expectation that they would remain confidential. The defendant claims that these same statements should also have been excluded because the officer did not give the defendant his *Miranda* warnings. However, this claim must fail because the defendant was neither in custody nor being interrogated by the police at the time the statements were made. The defendant claims that the trial court erred by admitting an exhibit containing a nurse's handwritten notes repeating certain statements made by the victim concerning the cause of her injuries, because these statements were inadmissible under the hearsay rule. However, the trial court properly admitted the statements under the excited utterance exception to that rule. The defendant claims that the trial court erred by giving a pattern rape instruction that included references to "fellatio" and "cunnilingus" because there was no evidence presented at trial establishing that the defendant had committed either act. However, we conclude that the instruction at issue fully and accurately stated the law. The defendant argues that the trial court improperly admitted certain exhibits because no chain of custody had been established, but this argument has been waived. The defendant challenges his ten-year effective sentence as excessive, but after thorough review we can discern no error in the defendant's sentencing. Finally, the defendant claims that the 2005 Sentencing Act is unconstitutional under *Blakely v. Washington*, 542 U.S. 296, 302 (2005), but we conclude that binding precedent firmly establishes that the 2005 Sentencing Act complies with *Blakely*. Consequently, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

B. Jeffery Harmon, District Public Defender, and Philip A. Condra, Assistant Public Defender, for the appellant, Robert Fann, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven H. Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

A grand jury indicted the defendant for aggravated rape in violation of Tennessee Code Annotated section 39-13-503, a Class A felony,[1] and incest in violation of Tennessee Code Annotated section 39-15-302, a Class C felony, after the defendant was found at night by police officers partially undressed on top of his stepdaughter in a parked automobile. At the defendant's trial on May 7-10, 2007, the following evidence was presented:

The victim testified that she was thirteen years old at the time of the incident. She testified that the defendant had been married to her mother for several years. On February 11, 2006, she traveled with a friend to a Christian Worship Center where she ate dinner and enjoyed fellowship with a large group of individuals who were associated with her friend's church. On her way back home, the vehicle in which she was riding had a flat tire. The victim testified that the defendant came to her location and helped to change the tire and that she left to go home with him.

The victim testified that, at an earlier point in the evening, she had asked someone to hold her cell phone because she was afraid that she would lose it. She testified that when she arrived back home, she realized that she had forgotten to ask for her cell phone. She testified that the individual to whom she had given her phone called her residence and explained that the cell phone was still in her possession. The victim testified that although she had originally planned to pick up the phone the following morning, the defendant volunteered to

---

[1] The charge was later reduced to rape, a Class B felony, due to a defect in the defendant's indictment.

drive her back that night. She testified that she and the defendant got into the defendant's four-door Honda Civic and started back to retrieve the phone.

The victim testified that somewhere along the drive, the defendant pulled off of the main road and into a ball park. The victim testified that she was familiar with this park because she had previously visited it with her parents. The victim testified that the defendant proceeded to tell her that he was "tired of me running my fucking mouth to my mom and that he was going to fuck me." The victim testified that she told him "no" and that the defendant responded by slapping her in the face. The victim testified that the defendant held her pinned to the car seat with one arm and locked the automatic doors so that she was unable to leave.

The victim testified that at the time of the assault, she was wearing only pajama pants, underwear, a bra, and a shirt, because she had changed her clothes after arriving home in the belief that she was going to wait until the next day to retrieve her phone. She testified that the defendant told her to take off her clothes and that she said "no." She testified that the defendant "jerked" off her pants and her underwear. She testified that the defendant rubbed his penis on her vagina and started putting his fingers inside her.

The victim testified that when the defendant raised her shirt up and started looking at her breasts, she told him to stop, and that he said "no." She testified that the defendant proceeded to hit her in the face and stomach. She testified that while this was occurring, she was located in the passenger side of the vehicle and that the defendant had climbed on top of her.

The victim testified that she suddenly saw lights outside their car and knew that someone else had arrived at their location. She testified that when the defendant saw the lights, he got off her and threw her pants in her lap. She testified the defendant called her a "bitch" and told her to put her clothes on – but kept her panties. The victim testified that the defendant told her that he would kill her if she ever told anyone.

The victim testified that the defendant had pulled his pants back up by the time a pair of police officers arrived outside their vehicle. She testified that Deputy Terry Dishman of the Sequatchie County Sheriff's Department came to her door and asked her what was going on. She testified that the defendant initially said nothing at first, and later told the officer that he was going to "take a piss." She testified that the defendant still had his shirt off despite the freezing cold weather. She testified that Deputy Dishman told her to get out of the vehicle and took her to his car. Once there, the victim told Deputy Dishman what the defendant had done and that the defendant still had her panties. She testified that Deputy Dishman took her to the hospital to undergo a rape examination. The victim was then shown and identified the panties that she had been wearing that night, and they were entered into

evidence.

On cross-examination, the victim testified that at the time of the incident she weighed about one hundred pounds and was 5' 1" tall. The victim also testified in further detail concerning the order in which the defendant had removed both his and her clothing, and discussed the timing of various phone calls made to various cell phones during the evening. When asked whether it would have been possible for the defendant to have rubbed his private parts on her private parts without her legs being parted, the victim testified that the defendant had "scooted them apart to where he could rub his private on mine." She testified that while this was occurring the defendant's pants were around his ankles and that he was in the passenger seat of the car facing her. She explained that he had just finished pulling down her pants and panties simultaneously. The victim testified that she was kicking and screaming while the assault was occurring.

The victim testified that in the time between the officers' arrival and the time they reached the doors of the Honda, both she and the defendant were able to get completely redressed, with the exception of her underwear. The victim estimated that the officers waited in their patrol car for approximately three or four minutes before approaching the defendant's vehicle. Defense counsel also questioned her concerning the variance in the number of times that she claimed that the defendant had hit her in prior accounts given to different individuals.

In addition to the victim's testimony, the State presented the testimony of Deputy Terry Dishman of the Sequatchie County Sheriff's Department. Deputy Dishman testified that on the night of February 11, 2006, he was working routine patrol and that Deputy Winfred Smith was accompanying him. He testified that around 11 p.m. that evening, they arrived at the John Griswold ball park in Sequatchie County. He testified that the police periodically patrolled the ball park after it was closed because there had been prior incidents of vandalism in the area.

Deputy Dishman testified that when he arrived at the park that night he saw a Honda Civic parked in the area. He testified that he positioned his patrol car to the left-hand side of that vehicle with its headlights shining on the front. He testified that when he got out of his patrol car he saw some activity inside the Honda Civic. He testified that as he neared the front of his patrol car he could see the back of an individual located in the passenger seat. He testified that he could see the bare skin of this individual's back. He testified that he approached the passenger side of and Deputy Smith approached the driver's side of the vehicle and that as they approached, the individual in the passenger seat moved over to the driver's side of the vehicle. Deputy Dishman testified that he could see this individual putting his shirt on. When Deputy Dishman opened the passenger side door of the vehicle,

he was able to identify the person in the driver's seat as the defendant.

Deputy Dishman testified that the passenger's side seat of the Honda Civic was tilted backward and that the victim was leaning back in the seat "squirming around." He testified that he asked the victim her age and that the victim replied that she was thirteen. Deputy Dishman testified that the victim was extremely nervous and was crying and shaking during this conversation. Over a defense objection on hearsay grounds, Deputy Dishman testified that the victim told him that she needed to talk to him. He testified that he took the victim back to his patrol car, where the victim repeatedly stated, "He made me."

Deputy Dishman testified that the victim told him that the defendant had indicated that he was tired of the way she was treating her mother, that he was going to fuck her, and that he had struck her three times in the face with his open hand. Deputy Dishman also testified that the victim told him that the defendant had her panties. Deputy Dishman testified that he transported the victim to the hospital after he told other officers on the scene that the victim had claimed that her panties were still in the defendant's possession.

On cross-examination, Deputy Dishman testified that at the time of the incident the defendant was 5'11" tall and weighed two hundred thirty-five pounds. Deputy Dishman testified that during the police investigation, no one attempted to measure the space between the front of the passenger seat and the glove compartment on the dashboard of the Honda Civic. Deputy Dishman testified that when he first approached the victim, she was not screaming, did not ask for help, and did not immediately run out of the car when he opened her car door. Deputy Dishman also testified that the victim did not immediately blurt out that the defendant was trying to rape her or ask to be taken away from him.

The State also presented the testimony of Deputy Winfred L. Smith, Jr., of the Sequatchie County Sheriff's Department, who testified that on the night of February 11, 2006, he was on patrol with Deputy Dishman. He testified that they were patrolling the John Griswold ball park at around 11 p.m. when they observed a Honda automobile in the park. Deputy Smith testified that it was snowing outside and that no other vehicles were in the area. He testified that they pulled in front of the Honda with their headlights shining on it. He exited the passenger's side of the patrol car and walked to the driver's side of the Honda.

Deputy Smith testified that as he approached the Honda, he could see the back of a large person in the passenger seat and that this person was not wearing a shirt. He testified that this person moved over to the driver's side of the vehicle as he continued to approach. Deputy Smith testified that he observed the individual putting a shirt on. He testified that when he reached the driver's side door he tapped on the window. When the window rolled down, he identified the individual inside as the defendant. Deputy Smith testified that a

passenger was also in the car. He testified that he instructed the defendant to place his hands on the steering wheel.

Deputy Smith testified that the defendant had a cell phone with him that night, and he could hear the cell phone ringing. He testified that the defendant told him that his wife was calling and that he eventually gave the defendant permission to answer the phone to tell her that he would call her back. The defendant did so. Deputy Smith testified that Deputy Dishman removed the passenger and took her back to the patrol car.

Deputy Smith testified that other officers arrived, and the defendant was removed from the vehicle. Deputy Smith testified that the defendant requested permission to call his wife, and Deputy Dishman gave him permission to call her to let her know his whereabouts. During the ensuing conversation, Deputy Smith testified that the defendant told the person on the other end of the phone that he was at the ball park, that he was in trouble, and that he was being accused of doing the same thing that another individual had been accused of doing. Deputy Smith testified that the defendant never provided any explanation for why he was at the ball park, other than to claim that he pulled in there to "take a leak." Deputy Smith testified that another officer on the scene took the defendant to a patrol car and that he had no further contact with the defendant.

On cross-examination, Deputy Smith testified that at the time of the incident, the defendant was a "rather large" man. Deputy Smith testified that he was present with other officers when the victim's panties were found on the ground after the defendant was placed in a patrol car. He testified that these panties were dry when they were discovered. On re-direct examination, Deputy Smith testified that the victim's panties were found on a path between the defendant's car and a patrol car and that this path had been walked by the defendant but not by the victim.

Nurse Janice Henson testified that she was working at North Valley Emergency, a freestanding emergency room associated with Grandview Medical Center, on the night in question. She testified that near midnight, the victim was brought to her for treatment. She testified that she took a medical history from the victim for purposes of diagnosing and treating her. Nurse Henson testified that the victim reported a history of having been sexually assaulted and reported that she had been slapped during this assault. Nurse Henson testified that the victim told her that the assault involved a penis penetrating the victim's labia, but the nurse later clarified that the penis may not necessarily have penetrated all the way into the victim's vagina.

Nurse Henson identified and authenticated several photographs taken of the victim on the night of the incident. These photographs were entered into evidence. Nurse Henson

testified that during her examination, she noticed that the victim's skin was red in several places in a manner that was consistent with her having been slapped. In addition, the witness identified an anatomical diagram of a small girl that contained her handwritten notes regarding the injuries appearing on the victim on the night of the incident, as well as statements from the victim concerning the cause of those injuries. Over the defendant's objection, this diagram was entered into evidence.

Nurse Henson testified that she performed several tests on the victim in the course of administering the sexual assault kit. These tests included taking a vaginal swab from the victim and combing the victim's pubic hair. Nurse Henson testified that she also took blood from the victim. Nurse Henson testified that she did not perform any oral or anal swabs on the victim because the patient had not reported any history of oral or anal rape.

On cross-examination, Nurse Henson testified that the victim arrived at the hospital at 11:36 p.m. and was discharged to her mother at 12:50 a.m. Nurse Henson testified that the results of many of the tests performed on the victim were within normal limits – including tests performed on the victim's eyes, ears, nose, and throat. Nurse Henson testified that the victim did not display any bruising or abrasions to her inner thighs and that there was no external trauma to the victim's labia. Nurse Henson testified that in order to perform a sexual assault exam a female must be positioned on her back and that when sitting in a chair, a woman's private parts are "completely shielded."

Investigator Jody Lockhart of the Sequatchie County Sheriff's Department testified that he was at the emergency room when Nurse Henson performed her examination of the victim and that he mailed the victim's sealed sexual assault kit to the Tennessee Bureau of Investigation ("TBI") crime lab afterward. Over the defendant's objection, Investigator Lockhart also testified concerning a conversation he overheard while he was working security at the General Sessions Court of Sequatchie County during a hearing involving the defendant. Investigator Lockhart testified that the defendant was still married to his wife at the time this conversation occurred.

Investigator Lockhart testified that while they were at the courthouse, the defendant's wife indicated that she wished to speak with the defendant and the defendant assented. Investigator Lockhart testified that he provided security while the defendant and his wife talked in an old jury room. He testified that he, the defendant, the defendant's lawyer, the defendant's wife, and two other inmates were in the room during this meeting. Investigator Lockhart testified that the defendant's attorney advised the defendant not to talk about the case with the officer present. Investigator Lockhart testified that during this meeting the defendant's wife repeatedly said to the defendant, "I cannot believe that you done this." Investigator Lockhart testified that the defendant replied that he could not have raped the

victim because he only stuck the middle finger of his left hand inside the victim up to the first knuckle.

On cross-examination, the defense counsel confronted Investigator Lockhart with an earlier statement he had made in a preliminary hearing in this matter, in which Investigator Lockhart testified that the defendant had stated that he could not have raped the victim because he had stuck his penis (rather than his finger) only a slight distance into the victim's vagina. The witness responded that he was testifying to the best of his memory. Investigator Lockhart also testified that at no point in his investigation did he take any measurement concerning the distance between the end of the passenger seat and the dashboard of the defendant's Honda Civic.

Other witnesses also testified on behalf of the State, including Detective Marty Gibson, who testified that he found a pair of light blue panties at the crime scene along the same general path (from the defendant's Honda Civic to a patrol car) that had been previously walked by the defendant; Officer Cody Smith, who testified that he took photographs of the crime scene (which he authenticated and which were entered into evidence); and several lab technicians from the TBI and Bode Technology who testified that they assisted in processing the victim's rape kit and that the DNA analysis they conducted was largely inconclusive.

Following this testimony, the State rested. The defense presented the testimony of Mr. Alec M. Long, Jr., a friend of the defendant who had attended the church fellowship with the victim on the night of the assault. Mr. Long testified that as he was driving the victim home, the van in which they were traveling had a flat tire and that the defendant drove out to help change it. Mr. Long testified that the defendant left afterward and took the victim with him. He testified that he looked for the victim's cell phone after he was informed it was missing and eventually found it. He testified that the victim's mother told him the defendant and the victim would be coming to retrieve the phone, but they never arrived.

The defense also presented the testimony of the defendant's former wife, who went over details concerning the numerous phone calls that had occurred between her and the defendant on the night of the incident. The defendant's ex-wife also testified that she did not remember ever hearing the defendant tell her that he did not rape the victim because he only inserted either his penis or his finger slightly into her vagina.

The defendant was advised of and waived his right to testify in his own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999), and the defense rested. The jury was charged and the parties made closing arguments. The jury left to deliberate at 12:10 p.m. on May 10, 2007, and returned with a verdict of

guilty of the crimes of rape and incest at 2:20 p.m. that same day.

At a sentencing hearing held on July 17, 2007, the trial court sentenced the defendant to ten years for the rape conviction and to a concurrent four and one-half years for the incest conviction, for a total effective sentence of ten years. The defendant filed a timely motion for new trial, which was overruled on November 29, 2010. This appeal promptly followed.

## ANALYSIS

The defendant raises numerous challenges to his convictions and sentences. The defendant claims that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred by permitting a police officer to testify concerning certain comments the defendant made to his wife in the officer's presence; (3) the trial court erred by admitting into evidence certain exhibits; (4) the trial court erred by instructing the jury that rape could be accomplished by cunnilingus and fellatio, even though there was no evidence that either act had occurred in this case; (5) the trial court applied an erroneous enhancement factor during sentencing; (6) the trial court erred by denying him an alternative sentence; (7) the trial court erred by imposing an excessive sentence; and (8) the 2005 Sentencing Act is unconstitutional under *Blakely v. Washington*, 542 U.S. 296, 302 (2005). For the reasons that follow, we deny each of these claims and affirm the judgments of the trial court.

## I.

The defendant claims that the evidence is insufficient to support his convictions. However, his argument is entirely based on numerous alleged inconsistencies in the evidence that was presented against him. The inconsistencies and conflicts in the evidence contained in the record provide no basis for reversing the defendant's convictions. Evidence exists in the record to support the jury's finding with respect to each of the essential elements of the defendant's offenses, and consequently his claim is denied.

Our supreme court recently re-articulated the well-known standards for reviewing a claim concerning the sufficiency of the evidence in *State v. Cross*, 362 S.W.3d 512, 523 (Tenn. 2012):

> When evaluating a challenge to a conviction based upon the sufficiency of the evidence, "we must determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); *see also* Tenn. R. App. P. 13(e); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). A verdict of guilty removes the presumption of innocence to which a defendant

had formerly been entitled replacing it with a presumption of guilt; accordingly, the defendant bears the burden of demonstrating the insufficiency of the evidence to sustain a guilty verdict. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011); *State v. Banks*, 271 S.W.3d 90, 137-38 (Tenn. 2008). In conducting this analysis, "we must afford the State the strongest legitimate view of the evidence and any reasonable inferences that may be drawn from it." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010); *see also State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009).

The defendant was convicted of rape and incest. Rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances," one of which is "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)(2) (2006). Incest is defined as "engag[ing] in sexual penetration . . . with a person, knowing that person to be . . . [a] stepchild [or] adoptive child. . . ." T.C.A. § 39-15-302. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . emission of semen is not required." T.C.A. § 39-13-501(7). Therefore, to support all the essential elements of both offenses, there must have been evidence sufficient for a reasonable jury to find beyond a reasonable doubt that: (1) sexual penetration occurred between the defendant and the victim; (2) the defendant knew the victim was his stepdaughter or adopted daughter; (3) the victim did not consent to the penetration; and (4) the defendant knew or should have know that the victim did not consent to the penetration.

There is sufficient evidence in the record to support the jury's conclusions with respect to all four of these essential elements. The testimony of the victim standing alone provides all the necessary evidence. The victim testified at trial that she was presently fourteen years old but that she was thirteen years old at the time of the incident. She testified that the defendant was married to her mother and that she attended the wedding ceremony. She testified that on February 11, 2006, she went to a gathering at a friend's church. She testified that she left her cell phone with someone she met on this trip, and that, although it had gotten dark by the time she arrived home, the defendant took her back in the direction of the gathering in his car, ostensibly to retrieve it. While on this trip, the defendant pulled off the main road into a ball park that they had visited previously. The victim testified that the defendant said that "he was tired of me running my fucking mouth to my mom and that he was going to fuck me." The victim testified that she said no, and the defendant slapped her in the face. Next, he locked the automatic doors and grabbed her arms. The victim

-10-

testified that the defendant "jerked" her pants and underwear off of her, slapped her again, and "rubbed his penis on my vagina . . . started putting his fingers in me . . . I told him to stop it and he said no, and . . . kept on" and "hit me in the face [and] stomach." The victim testified that the defendant only stopped because the police arrived and that he threatened to kill her if she told anyone. This evidence suffices to support the jury's conclusion with respect to all four of the essential elements of both offenses. Any evidence that might conflict with the victim's testimony would, at most, serve to create a conflict in the proof – a conflict which the jury resolved against the defendant, and a conflict that this court cannot revisit on appeal. *See State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011).

In this case, however, the victim's testimony establishing the essential elements of the offenses was corroborated in a number of important respects by the testimony of other witnesses. The victim's mother testified that she was married to the defendant from January 28, 2002, to September 25, 2006. Police witnesses testified that on the night in question they approached a parked car and saw the defendant in the passenger seat with his back facing out of the front windshield and his shirt off. They testified that the defendant moved back to the driver's seat and attempted to put his shirt back on when he became aware of their presence and that they found the victim in the passenger seat. One of the officers testified that the victim was nervous, crying, and shaking, and that she told him that she needed to talk to him. He further testified that the victim stated "he made me do it" repeatedly once she had been separated from the defendant, and she told him that the defendant had her panties. Another officer testified that he found the victim's panties on the ground outside of the vehicle. Both law enforcement witnesses and the nurse who performed a subsequent examination of the victim testified that the victim had red marks on her face and neck. The nurse also testified that the she found red marks on the victim's stomach and thigh that were consistent with the victim having been slapped in these areas and redness on the victim's arm that was consistent with her having been firmly gripped by a hand. All of this testimony serves to reinforce the conclusion that the State presented sufficient evidence to support the essential elements of the defendant's crimes.

Seeking to avoid this outcome, on appeal the defendant bemoans the fact that "[i]t is a very simple task to read through a transcript of a trial and find a sentence that asserts a specific fact and, when taken out of context, could serve as a basis for a jury verdict." Nonetheless, the defendant urges that "the entire record of this cause establishes at best a sexual battery and not a rape or incest conviction." We disagree with this assessment of the record. The conflicts in the record evidence to which the defendant directs our attention are of little significance – such as discrepancies in the number of times the victim stated the defendant hit her during the assault. The defendant also urges that he was too large of a man to have committed the crime in the manner described by the witnesses, but this assertion does not find adequate support in the record. Moreover, even if we believed that the discrepancies

noted by the defendant were more significant and that his claims concerning his inability to commit the crime were more credible, the defendant would still not qualify for relief. Under the applicable law, it is not the province of an appellate court to re-evaluate the evidence contained in the entirety of the record and second-guess the jury's conclusions. The defendant's claim is denied accordingly.

## II.

The defendant's next claim is that the trial court erred in overruling the defense's objection to certain testimony given by a police officer concerning a statement the defendant made to his wife in the officer's presence.[2] Decisions concerning the admissibility of evidence at trial are entrusted to the discretion of the trial court. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court's exercise of discretion will not be reversed on appeal unless the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Id.* (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). The defendant has failed to establish that the trial court abused its discretion by admitting the testimony at issue.

The defendant urges that the statement at issue was protected by the husband-wife privilege. Martial communications are privileged in a criminal proceeding only if, *inter alia*, "[t]he communications originated in a confidence that they will not be disclosed." T.C.A. § 24-1-201(c)(1)(A). The communications at issue took place in a courthouse, in a room that was occupied by the defendant, the defendant's mother, defense counsel, two other inmates, and Investigator Lockhart, the police officer who would later testify concerning the content of the communication. The defendant could not have had any reasonable expectation of confidence in any statements that were made in the presence of so many individuals.

The bulk of the defendant's argument on this issue does not quarrel with this conclusion, but is instead devoted to arguing that the police officer's testimony concerning

---

[2] The State argues that the defendant has waived appellate review of this issue and many others by virtue of his failure to prepare an adequate record. The party seeking appellate review of an issue has a duty to prepare a record that conveys a "complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). The defendant raised this claim in the trial court by making a contemporaneous objection and by raising the issue again in his motion for new trial. The defendant included a transcript of the trial proceedings that includes discussion of this issue. However, the defendant neglected to include a copy of the transcript of the hearing on his motion for new trial. The defendant assumed some risk that this court would find waiver when he failed to do so. However, because the defendant clearly preserved the issue itself in his motions and on appeal and because the trial transcripts contain extensive discussion between the parties and the trial court on this issue, we do not deem this issue waived by virtue of the defendant's failure to prepare an adequate record.

the statements the defendant made to his wife at the meeting were unreliable because the police officer failed to perform certain investigative tasks that the defendant requested and because the defendant's former wife testified on the stand that she did not remember her husband making the statements. However, whether the statements at issue were reliable or unreliable is not germane to the legal analysis concerning the defendant's claim of privilege, and matters of credibility are generally entrusted to the jury. What matters is that the statements at issue were essentially made in public and therefore not privileged communications. Consequently, the defendant's challenge to the trial court's decision to admit Investigator Lockhart's testimony is denied.

## III.

The defendant further claims that the trial court erred by admitting Investigator Lockhart's testimony because Investigator Lockhart did not administer *Miranda* warnings to the defendant before he made the statements. The defendant asserts that, as a result, admission of Investigator Lockhart's testimony violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights under the federal constitution, as well as their state constitutional counterparts. As we have stated, we review a trial court's decisions concerning the admissibility of evidence under an abuse of discretion standard.

It is well established that both the Fifth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution protect an individual's right not to incriminate himself. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 474 (1966); *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). A vital component of this right is the longstanding judicially-prescribed prophylactic rule that a suspect in custody may not be questioned by police until after he has been apprised of certain of his constitutional rights, including his right to remain silent and his right to be represented by counsel – a well-known process referred to as giving the suspect his *Miranda* warnings. *See Miranda*, 384 U.S. at 474.

As a judicially-crafted prophylactic rule, the *Miranda* requirement is justified only by reference to its purpose. *See Maryland v. Shatzer*, 130 S. Ct. 1213, 1220 (2010). It applies only when a defendant is in custody and only when a defendant is subjected to interrogation. In this case, neither condition has been satisfied.

The United States Supreme Court has held that incarceration does not constitute custody for *Miranda* purposes. *Id.* at 1224-25. The Court reasoned that an incarcerated prisoner's continued detention does not depend on what he does or does not say to an interrogator, and as a result there are no inherently compelling pressures placed on the inmate by virtue of his incarceration that might reasonably be expected to lead to an involuntary

-13-

confession. *Id.* Similarly, although the defendant in this case was under police observation while he was in the courtroom in the sense that an officer was present to ensure his protection and the protection of the other individuals present, he was not in "custody" for *Miranda* purposes because this form of police observation would continue regardless of anything he might say. His freedom did not depend on the content of any discourse he might have with the officer or anyone else present, and nothing else about the police observation at issue might reasonably be expected to lead to an involuntary confession. *See id.* at 1225-26.

Moreover, the defendant has failed to establish that he was being interrogated by the police at the time he made the incriminating statements. The defendant does not allege that Investigator Lockhart ever asked him a question. The record reflects that any interrogation that may have occurred was being done by the defendant's wife, who had requested the meeting. The record reflects that the defendant consented to the meeting against the advice of counsel and that Investigator Lockhart overheard the statements at issue while he was in the room for purposes of protecting the parties from each other and from other inmates who were present.

The record reflects that the defendant made the inculpatory statements at issue after his wife demanded to know why he had raped her child. The federal and state constitution provisions cited by the defendant protect him against abusive uses of power by the State. They provide no protection from the wrath of an injured spouse. The defendant's claim that he was constitutionally entitled to receive *Miranda* warnings prior to engaging in consensual conversation with his wife is denied.

## IV.

The defendant's next claim is that the trial court "erred in admitting Exhibit 24," which was an anatomical drawing of a girl, on which a nurse had made various notations. These notations include markings on the drawing of the girl's body intended to indicate areas of redness along with statements attributed to the victim. For example, one notation points to shaded areas on the drawn girl's stomach and thigh and states: "Redness – pt states she was slapped." Another notation points to a shaded area on the drawn girl's forehead and states: "Redness – states he hit her." The defendant claims these statements were inadmissible hearsay. *See* Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law.").

The parties agree that the anatomical drawing is only admissible if it falls within the hearsay exception created by Tennessee Rule of Evidence 803(4), which excepts from the general prohibition against hearsay "Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the

inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." "The rationale justifying the exception is two-fold: (1) a statement made by a patient to a physician is presumptively trustworthy because a patient is strongly motivated to speak the truth in order to receive proper diagnosis and treatment; and (2) any statement upon which a physician will rely as a basis for diagnosis and treatment is also sufficiently reliable for consideration by a court of law." *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997).

Prior to admitting otherwise inadmissible hearsay evidence pursuant to this exception, when the declarant is a child, a "court must look to all the circumstances surrounding the statement to determine whether the statement was made for the purposes of diagnosis and treatment and is thus admissible." *Id*. Courts should "consider[] all the circumstances of [the] child's statement because the child's ability to articulate the reason for the statement may be affected by age or developmental maturity." *Id*. at 332. If a court finds that the statements are "reasonably pertinent to diagnosis and treatment," then statements concerning "the general character, cause, or source of the problem" may be admitted. *Id*. at 331. Statements identifying the perpetrator as a member of the declarant's family may also be admissible because they are "pertinent to the diagnosis and treatment of an emotional or psychological injury suffered." *Id*. at 333.

Prior to admitting Exhibit 24, Nurse Carol Henson testified that she treated the victim at a hospital emergency room for physical injuries on the night of the incident. The nurse also testified that the victim told her that she had been slapped and sexually assaulted. The nurse testified that the victim had redness and swelling that was consistent with her having been slapped and abrasions that were consistent with her having been assaulted. The State then moved for admission of Exhibit 24, which contained the Nurse's handwritten notes indicating essentially the same things. Our review of the exhibit and the record as a whole leads us to conclude that these statements were made by the victim for purposes of receiving medical treatment and that her identification of the defendant as the man who assaulted her was reasonably pertinent to her diagnosis and treatment.[3]

The defendant raises two arguments against Exhibit 24's admissibility: (1) that the drawing was incomplete because it did not contain notations of "any abrasion, laceration, burns, or skin breakdown," had "no rating on the pain scale," and did not reflect the presence of "edema," and (2) the notations and shading on the drawing "exaggerate" the degree of redness on the victim's body that night (as the defendant alleges can be seen from a comparison of the diagram with actual photos of the victim). However, both of these

_____

[3] Because the nurse had already given direct testimony covering the notes' contents, it would have been difficult to discern any prejudice to the defendant caused by the exhibit's admission in any event.

arguments relate only to the weight that a fact-finder should accord the drawing, not its overall admissibility. It is the province of the jury (1) to determine how much weight the drawing and its accompanying notes should be accorded in light of its degree of completeness, and (2) to resolve any discrepancy between the drawing and any other evidence presented at trial. The jury resolved these issues against the defendant, and its decisions in this regard will not be revisited on appeal.

## V.

The defendant claims that the trial court erred by giving a pattern rape instruction that included reference to "fellatio" and "cunnilingus" because there was no evidence presented at trial that the defendant committed either act. Defendants have a right to "a complete charge of the law applicable to the facts of the case." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). However, "[t]he refusal to grant a special request for instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009).

"In determining whether instructions are erroneous, th[e] Court must review the charge in its entirety and read it as a whole." *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). In this case, the instruction given was based on the statutory definition of rape that we have previously discussed. We conclude that it fully and accurately stated the law. While that statutory definition of rape, as embodied in the trial court's instruction, recognizes the possibility that rape might by acts that were not in fact committed in the case at bar, we do not believe this possibility rendered the instruction confusing or misleading in any way. Upon hearing this instruction in conjunction with the court's remaining instructions, no reasonable juror would conclude that he or she should find the defendant guilty of rape based upon any act that was not proven at trial.

Moreover, requiring trial courts to provide an instruction in each rape case specifically tailored to the particular evidence that was presented at trial, as the defendant suggests, might itself lead to considerable confusion. The varying resulting instructions would often diverge from a layperson's understanding of the manners in which rape might be committed. For example, had this jury been instructed that it could only find the defendant guilty of rape if it found that the defendant had penetrated the victim with his hand or his penis, the jurors might naturally wonder why rape could not also have been committed by means of oral penetration. To illustrate the point more clearly, in cases in which the alleged acts of rape were committed only by oral means, jurors would certainly be confused if they were given a rape instruction that omitted any reference to the possibility that rape might be committed by the act of a penis penetrating a vagina – as such penetration, when not consensual, is the quintessential example of rape. The cases cited by the defendant entitle him to a full and

clear statement of the law applicable to the facts of his case, not to instructions perfectly tailored to match in every respect the evidence that was presented at his trial. The defendant's claim is denied.

## VI.

The defendant claims that the trial court erred by admitting two statements the victim made to officers made on the night in question: "I need to talk to you" and "he made me do it." The defendant claims that these otherwise hearsay statements were erroneously admitted as excited utterances. Statements that constitute "excited utterances" on the part of the declarant are exempted from the general prohibition against hearsay testimony. *See* Tenn. R. Evid. 803(2). Excited utterances are statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* To qualify for admissibility as an excited utterance, a statement must relate to a startling event or condition that suspends the normal reflective thought of the declarant and must be made while the declarant is still operating under the stress or excitement of the event or condition. *See State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010).

After reviewing the record, we can find no fault with the trial court's conclusion that the statements at issue were excited utterances. The officers testified that they interrupted the defendant and the victim while they were both occupying the passenger seat of a parked car and that the defendant was at least partially undressed. Both the act of sharing a single car seat with a partially undressed grownup and the ensuing interruption by the police officers would qualify as events that would suspend a thirteen-year-old's normal thought processes (*i.e.* they are "startling events"). The victim made the two statements shortly after the officers' interruption. The statements concerned the activity that had just taken place. All of the necessary conditions for admissibility of the statements as excited utterances were satisfied.

## VII.

Because Officer Dishman testified that they were spoken in a normal tone of voice, the defendant alleges that two statements made by the victim – "I need to talk to you" and "he made me do it" – demonstrate that the victim was a willing participant on the night in question, and as an "accomplice," her testimony needed to be corroborated by independent evidence. *See, e.g., State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The defendant claims that the trial court erred by failing to instruct the jury concerning the corroboration requirement. However, we reject this claim without further discussion because, *inter alia*, there is no evidence in the record that would support the defendant's allegation that the victim was a willing accomplice in the sexual activity. The victim's mere act of speaking in

-17-

a normal tone of voice, without more, does not lend itself to a reasonable inference that the victim consented to the sexual activity at issue.

## VIII.

The defendant argues that the trial court improperly admitted certain exhibits because no chain of custody had been established. However, the defendant has cited no legal authority in support of this argument. Consequently, we conclude that this argument has been waived. *See* Tenn. R. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

## IX.

Finally, the defendant challenges the trial court's decision to sentence him to an effective sentence of ten years. As best we can determine, he claims that (1) the trial court erred by applying an enhancement factor, (2) the trial court erred by denying him alternative sentencing, (3) the 2005 Sentencing Act is unconstitutional under *Blakely v. Washington*, 542 U.S. 296, 302 (2005), and (4) the trial court violated his rights under the Confrontation Clause by not allowing him to examine and cross-examine witnesses at his sentencing hearing. Each of these claims lacks merit.

The burden of demonstrating that a sentence is erroneous is placed upon the appealing party. *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). We review a trial court's sentence *de novo*, but with a presumption that any factual determinations made by the trial court are correct. *Id.* This presumption "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *Id.* at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails" and we review the defendant's sentence under a plain *de novo* standard. *Id.* at 345.

## A.

At the defendant's sentencing, the trial court found two enhancement factors to be applicable: factor (4), "A victim of the offense was particularly vulnerable because of age or physical or mental disability," and factor (14), "The defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense." T.C.A. § 40-35-114 (4) & (14) (2007). The defendant appears to argue that there is no record evidence to support the trial judge's

application of the latter factor, as he argues that "there was no proof offered by any witness that [the victim] enjoyed a close personal relationship with the defendant." However, it is not necessary for the State to establish that the defendant and the victim had a close personal relationship before this factor may be applied. Enhancement factor (14) may be applied whenever "the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith" and that relationship was abused in the commission of the offense. *See State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). Our supreme court has made clear that where "the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999). Indeed, an offender's status as the victim's stepfather has been referred to as an "obvious" example of occupying a position of private trust. *Kissinger*, 922 S.W.2d at 488. There is no dispute that the defendant was the victim's stepfather. The defendant abused this position by using it to get the victim alone for purposes of assaulting her. Consequently, the trial court did not err by applying this enhancement factor.

**B.**

The defendant challenges the trial court's decision to order him to serve his sentence in incarceration. Alternative sentencing was available to the defendant because he was sentenced to ten years or less. *See* T.C.A. § 40-35-303(a). However, the 2005 sentencing amendments – enacted prior to the defendant's crimes – abolished any presumption that defendants are entitled to alternative sentencing. *See Carter*, 254 S.W.3d at 347. Pursuant to those same amendments, especially mitigated or standard offenders who commit Class C, D, or E felonies are considered favorable candidates for alternative sentencing absent evidence to the contrary. *See id.* Rape, however, is a Class B felony, and consequently the defendant did not qualify as a favorable candidate for alternative sentencing. The trial court denied the defendant an alternative sentence on the grounds that doing so was necessary to avoid depreciating the seriousness of the offense. *See* T. C. A. § 40-35-103(1)(B). The trial court's conclusion in this regard was sound.

The trial court reasoned that the rape at issue involved a "breach of the trust of the parent and child, which is a very, very serious crime." The defendant argues that this reasoning was faulty, again urging that there was no evidence in the record establishing that the victim and the defendant had a close relationship. We reject this argument on the grounds that the record amply supports the trial court's conclusion that the defendant's offense involved the abuse of a position of presumptive trust. For legal purposes, a stepparent stands *in loco parentis* and occupies a position of presumptive trust even if the stepparent's relationship with their stepchild has been distant or strained. The record is clear that the crimes at issue were only accomplished by the defendant through the abuse of his

status as her stepfather; the defendant was only able to get the victim alone because, as her stepfather, he was entrusted to escort her away from the residence at night.

Other factors also support the trial court's conclusion that this crime was especially reprehensible and offensive. The defendant assaulted the victim shortly after she attended a church fellowship, and did so while he was ostensibly charged with returning her to meet with members of that fellowship. The defendant repeatedly hit and slapped the young victim in the face and stomach during the course of the assault, and the victim suffered physical injuries that were categorized in the testimony given by the nurse who treated her following the assault. After the assault, the defendant threatened to kill the victim – his own stepdaughter – if she ever reported the abuse. Moreover, the defendant verbally blamed the young victim for inviting the assault with her behavior, explaining to her prior to the assault that he was going to have sex with her to punish her for talking back to her mother. The record amply supports the trial court's conclusion that the defendant's incarceration was necessary to avoid depreciating the seriousness of these offenses.

### C.

The defendant claims that his sentences violate *Blakely* because, he asserts, *Blakely* stands for the proposition that any factor affecting a defendant's sentence must be decided by a jury. However, the Tennessee Supreme Court has already expressly ruled that the 2005 Sentencing Act's "removal of the presumptive sentences and rendering the guidelines advisory cured the Sixth Amendment defect noted in *Blakely v. Washington*." *State v. Banks*, 271 S.W.3d 90, 144 (Tenn. 2008). The *Banks* court observed that the 2005 Sentencing Act accomplished by legislative action the precise remedy – rendering the governing sentencing considerations merely advisory rather than mandatory – that had been imposed by the United States Supreme Court when it found the then-existing federal sentencing guidelines unconstitutional under *Blakely*. *See United States v. Booker*, 543 U.S. 220, 245-46 (2005). The *Banks* court reasoned that because the advisory guideline structure had been imposed as a remedy to a *Blakely* violation by the United States Supreme Court, "judicial fact-finding in sentencing [is] permissible so long as sentencing guidelines [are] advisory rather than mandatory." *Banks*, 271 S.W.3d at 144. If the defendant seeks to have *Banks* and *Booker* overturned, he will have to seek relief before a higher tribunal. The defendant's claims for relief before this court are denied.

### D.

The defendant claims that "his right to confront and cross-examine witnesses was denied" during his sentencing. However, the record reflects that the defendant never sought to introduce witnesses at the sentencing hearing, nor did he raise this issue in the trial court

*via* any motion or objection. In addition, the issue was not raised in the defendant's motion for a new trial. Finally, the defendant's brief cites no legal authority in support of this argument. Consequently, we conclude that this argument has been waived. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); Tenn. R. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-21-